All right, our next case for argument is 22-2109, AI Visualization v. Nuance Communications. Mr. Vinicoda? Correct, Your Honor. Okay, good. Come on up, Mr. Vinicoda. Thank you, Your Honors, and may it please the Court. Again, my name is Rajkumar Vinicoda, counsel for Appellant AI Visualize. The District Court's decision to invalidate the patents in suit under Section 101 is premised on a fundamental misunderstanding of the technology. The District Court disregarded and replaced key limitations of the claim, leading to its incorrect and overgeneralized determination of what the asserted claims are directed to. When read correctly, without reading out and replacing inventive features, the asserted claims are directed to patentable subject matter. I'll start first, for example, with Representative Claim 1 of the 609 patent, which provides an invention that's not directed simply to retrieving data or caching, as the District Court held. Rather, these claims are directed to novel systems for providing 3D virtual views from extremely large datasets, among other things, by 1. determining where frames that make up the 3D visualizations are stored locally, 2. dynamically creating remaining frames required for the 3D visualization from the centrally stored large dataset, and 3. sequentially combining these stored and dynamically created frames to create the 3D visualization the user requested. I'd like to address the 3D visualization issue later, and I'm sure we're going to get to that. But it just seems to me that, bottom, the claims are directed to the abstract idea of retrieving, manipulating, and displaying data. And our case law is pretty clear on that. This is ineligible subject matter. You're right, Your Honor. If the claims were directed to that abstract concept, your case law is clear. However, we do disagree that these claims are directed to that abstract. We believe these claims are directed to the very specific issue of creating the 3D visualization from that BVD dataset. Particularly, the reason why is from the specifications in column 1 and 2 of the 609 patent. It teaches that there are two main problems that were in the prior art. Number one, the bandwidth latency issue of transmitting a large set of data, and also the processing information of the BVD set to create these 2D frames that eventually becomes a 3D virtual view. Doesn't the patent itself acknowledge that technology exists to present richer 3D views from the existing 2D views? It does, Your Honor. There's no dispute with that. In fact, it says that in column 2 also. What the issue was, the actual problem is, how do I transmit? If I have created... Are you claiming that the 3D dimensional views is the claim at best? No, Your Honor. What we are saying is how the 3D virtual view is created now. So, in column 2, with the Klaus article, where is it? You're claiming the how. We're claiming how, yes, Your Honor. The very specific how. When you look at the claim at how, it's retrieving information, displaying information, and manipulating information. That's how it does it. The only problem with the how, it doesn't tell us how it's going to do that. All it does is tell us. Actually, Your Honor, it does. If you look at claim 1 on appendix 66, specifically the web application limitation, I think this is where the crux of this whole argument is going to be, between both sides. In that limitation, there are multiple steps, which basically says a user will ask for a request for a 3D visualization. That request then will do one of two things, or actually does two. You can actually look at figure 3, which actually lays out the algorithm for that. It will look to look at the local cache or storage to see if there's existing frames. If not, it will send the request over to the central location to create more frames. This is where I want to pause for a second. New frames potentially have to be created now. They're not stored. They were never there in the central location. New frames are going to be created to fill in the gaps, essentially, for what the user requested. Those frames get transmitted back to the local processor, in this case it would be a tablet or something like that. Those are then combined with the stored frames. There, right there, that break is different from the case laws, what we cited, with respect to just retrieving, transmitting, and combining again, because there was a natural creation step in the central server for frames that were missing in the stored, in the local area. And with that, what I just said is exactly, to answer your question, Your Honor, is how the virtual views are made, at least with respect to claim 1 of these patents. That's the how. Appellees had argued in their brief, there's no explanation of the how. Well, it's right there in the claims. Perhaps they were actually talking about the... What's right in the claims? The how to make the virtual view. I'm confused. You make it by creating frames? So I'm using their argument, Your Honor. I see the specification as describing the general idea of a user creating virtual views, but I don't see any details about how the server actually implements the function. And that's my problem. The closest you get, I'll tell you, is column 9, line 34. That's the closest you get. But it's still just very general. You don't... You're saying here's the how, but the how is really a function. It's not a how. Like there isn't... You don't explain how this was actually going to occur. If you may, Your Honor. It's like me saying care cancer by care cancer. That's not the how. I understand, Your Honor. Let me sort of back up a little bit. There's three kind of concepts I want to make sure that everyone understands. We have the VBD, which is the core data set. From the VBD, we create frames. And those frames creations first are outside the scope of, I think, even this argument. The how those are created is actually end of column 8, beginning of column 9, is how those actual frames are created from the VBD set. That's where the specifications teach it. But that how is actually more related to enablement, which is outside the scope here. Once those frames are created and bottom of column 8 to the top of column 9 explains that, which is in the central server, then those get transmitted to the local device. And if there's actual frames that have already been stored locally, the patent claim itself then says you combine those, and that creates what's called a virtual view. We're really not looking at frames here. We're looking at virtual views for the concept. Okay, well, we're looking at virtual views. Correct. Not frames. Correct. When you say frames, it's delaying some sort of physicalness to this. And there is none. So we're looking at views. And you're not creating the views. You're bringing information together to a local station in order so that the user can utilize the views. But to answer your question there, the virtual views are, if you look at the claim language right there, is a series of frames. The virtual views is a series of data, of information. Which, okay. Right? I agree. It is data. It is data. So you're moving, basically what you're doing is you're moving this information around from one location to another. You're bringing it very close, as closely as possible to the user, so that the user can look at these views without any type of latency involved or any type of disruption. Respectfully, Your Honor, the issue here is when I combine these elements, these three steps. Again, what we have to also go back, again, under ALICE Step 1. So let me just go right back to ALICE Step 1 to answer your question. Is the claim as a whole making any improvement to the existing technology at the time? What's the advancement over the art? Maybe the answer, and this is just, I think, in one part. This is a 609 patent. It says that the field of the invention, this invention, this invention, and we're in Appendix 58, column 1, lines 15. This invention relates to a method and system for viewing at a client computer a series of three-dimensional virtual views transmitted over the Internet of a volume visualization data set contained in one or more centralized databases. I believe that to say that we're moving information around. And you know that our case law has said that that is not patent subject to ALICE Court. I agree. If you generalize it, over-generalize it to that level, the case law of this court does say that. Well, even when you were talking about what you thought was the specific how, it was, well, if the view is on the download server, use it. If it's not, get it from the central server. I mean, that's just manipulating information. Again, using the – I want to – I'm not trying to correct everything, but it's frames. The views are – I don't care if it's frames or not. I mean, this isn't a patent on how to create those frames. It's a patent on how to use the computers to more efficiently get a 3D dimension, right? Using computers to more efficiently do an abstract idea is not patentable. Two points. One, we're still in the pleading stage, and the specifications say that to just use a computer, the prior art couldn't do it. It was impractical and impossible. That's the language in column two. But you're not claiming a special computer here. No, what we're claiming is by using these three steps, we're finding an advancement over that limitation. Sir, what are those three steps? Okay. Collecting data, transferring data, and manipulating data. We had a step. We have to still create the data. That's the critical aspect, and I think that's the point of contention, which is at the time when a user asks for a view and I cannot find stored local frames, I have to go back to that central server, agree to the VVD set there. But that VVD set now has to do processing and create additional frames to send back. That point right there is what we're saying is not abstract. That is the point of where coming back and adding it with the rest of the claims has now created that advancement. Maybe this simplification is what you don't like, but the 3D view is on the central server. No, Your Honor. The data is on the central server. It's 2D planar. It's a CT scan. All the data you need to put together a view are on the central server. The data is there, but you still... Actually, the patents take... So, I've got it. You have data. The data is there. You have data there. And some of the data may be downloaded onto the local server. That is not correct, because the data has to be... What's on the local server? So, on the local server? So, on the local server is the data that frames, okay? So, some of the data is on the local server? Yes, that's what it's doing. More about the view. The view is there, too. And then, if it's all there, then it's all there. You don't need to do anything. But if it's not all there, you have to go back to the central server to get more to complete the view. Yeah, but the distinction is what are you getting more of, okay? You're just not getting the CT scan and sending it over. Imagine me being a CT scan, and I want to become three-dimensional. I'm going to put a plane here and then put my side over here, and all of a sudden, all my 3D organs come out. I mean, it sounds like a nifty software program to get really quick images, and maybe it should be patentable, but it doesn't sound to me like it's patentable under Atlas and our precedent. Again, you know, we try to explain it all in our briefing, and, Your Honors, my time is coming up for my rebuttal. But if there's more questions here... Okay, we'll take the rest of your time. Thank you. Desai? That's correct, Your Honor. May it please the Court, Anish Desai here for Nuance and Mach 7. I'm just going to jump right into the Step 1 issue and the district court's decision and then addressing the argument that this is about creating the requested views. So first, AIB doesn't disagree as to what's the appropriate question for Step 1. It's what does the patent assert to be the focus of the claimed advance of the prior? There's no dispute there. And the Court's characterization followed that standard, and it comes directly from the specification. Column 2, lines 17 to 21, that's admitting how the prior teaches that volume visualization from a server, you can obtain it from a server without transmitting raw scans. So you can obtain the frames, the server can do all that work, and then you can transmit what you need to the client device. That's admitted as being known. Column 2, lines 35 to 48, that's where they introduce the problem, overcoming bandwidth concerns by providing a common and centralized infrastructure for receiving, storing, processing, and viewing large medical scans. And then the key really is at columns 12, 31 to 49, and column 13, 10 to 38, where this issue of bandwidth usage is addressed by caching. The enhancement is the user makes a request, you check to see if the frames are stored locally, and if all the requested frames are not there, you go to the server to get them. Would you agree that a potential claimed advance of the patent is to overcome the problem that was known at the time in the art of latency and bandwidth? This pen answers those two problems. And that is addressed using this caching, which the court addressed and said obviously is a very well-known conventional technique, not patentable subject matter. The pen doesn't create a new apparatus of any kind. That's correct. All of the components... It doesn't require a specialized computer. All of the components, no dispute, all the components to claim, generalized components, no specialized components required. That's not in dispute. So now let me talk about the issue that was raised by counsel, which is this is about creating the requested views. If you look at the claims, they recite nothing more than the generic step of creating the requested frames of the requested views from the data set in the central storage medium. So that's just a generic step. There is no how there of how the server is going to create the views. And then if you look at the specification, it confirms that creating the views, that generic step is not the claimed advance over the prior art because the specification admits that that's already known. In column one and column two of the patent, it tells you that the background art involved these 3D virtual views that are created from 2D scans. So you have a 2D scan, a set of database with 2D scans, and you can create 3D views from those 2D scans. But that's all known. And it's even known how to do that using a server-client interaction. So what the claims recite, while they recite this step of creating the virtual views of the server, that's not what they are directed to when we ask what's the claimed advance over the prior art. The claimed advance is transmitting only what you don't have stored locally. It's not the step of creating the virtual views. But the claimed advance does address a problem in the art at the time of the invention. And that's latency problems. So you get a 3D picture that's distorted, continues to distort it, and bandwidth. It ate up a lot of bandwidth and gave you a bad picture. And this invention is supposed to come along and give you a better picture by catching some of the data locally and only bringing in data as it's needed in order to get rid of the distortions. It deals with that latency problem, and therefore it deals with the it requires more bandwidth. Right, but the problem is that the invention or the improvement is the abstract idea itself of caching. And there's the case law we cited in our brief that, from this court, pretty clearly saying that caching is an abstract concept. And so even though caching does improve computers, you can't simply claim that as your improvement. Abstract concepts can improve computers, can make them more efficient, but you can't simply claim that. You have to claim more than that. And that's the issue here. And there's really no debate that what they are claiming is caching. It says it in their patent spec, and that's what they even accused of infringement in their complaint. I believe it was Appendix 146 where they actually say that this is what we're accusing. Step 2? Yes. I think Step 2 is actually quite simple once we have accepted for Step 1 what the claims are directed to, how Judge Andrews decided it. That's correct. And here I think there's clearly nothing to say in the patent, which is why you didn't hear much about Step 2. So for Step 2, for the Group 1 claims, there were three groups of claims. For the Group 1 claims, beyond the generic computer components and the generic functional steps of storing, retrieving, and transmitting data, the steps that we're focused on are the steps of checking if data is stored locally, and if not, obtaining the data from the server. And that is the well-known routine and conventional concept of caching. Do the Group 1 claims have a limitation that is directed to determining which frames should be stored locally? They simply say the step of determining whether these frames are stored locally. So that is the step. That's how caching works in any situation. You determine if you have it locally, and if not, you go retrieve it from somewhere else. If you're web browsing, it's the same principle. No, that's not what I'm asking. Does the claim to the Group 1 claims have a determining step that decides which pieces of data to store locally, and which pieces of data not to store locally? I don't believe so how you frame that. I think what the claim says is determining if any frame of the requested views is stored on the local storage medium, and then transmitting a request for any frame that is not stored. I don't believe as you're on a frame that that's what's claimed. Doesn't it use a unique identifiable key in order to select the view? That is the Group 2 claims. And again, I think they're claiming simply the abstract idea of using an identifier. I mean, we have the secured mail case and the personal web case to talk about. Identifiers can make things more efficient, but you can't simply claim using a unique identifier to see if something is stored locally. That's claiming the abstract concept itself. There's nothing in the claims about how the unique identifier is generated, what the nature of it is. Again, I don't think you've heard any argument, you'll see in the argument from the other side, that the inventive concept here is the unique identifier. That addresses the Group 2 claims. And the last thing is the Group 3 claims, where you have this transmit low-quality data first, then transmit high-quality data. And this is simply the common-sense principle that's discussed in the specification that low-quality image data can be transmitted faster than high-quality image data. And that's exactly what Judge Andrews said, which is this is a common-sense principle. It's not an inventive concept sufficient to transform the claims beyond an abstract idea. And I don't think there's actually any argument for plaintiff that that is an inventive concept. And I think also to the point of whether it addresses the bandwidth issues, it cannot, because you have to transmit both the low-quality data and the high-quality data in the claim. So it's not as though you're avoiding having the need for the bandwidth to transmit the high-quality data. So I think that addresses the Step 2 issues. And unless Your Honors have any questions, I see my time. Thank you, Mr. Desai. Thank you, Your Honors. I'd like to jump straight to what Judge Moreno was talking about with respect to Step 2. Counsel just said essentially the abstract concept is caching now. So if we're saying the abstract concept is caching, Step 2 says, is there anything in the claimed features that make improvements to that? There are. If you actually look back to the same steps again, we have to go to the local storage. That is caching, because what is caching? Caching says I give a request, the memory gives it back to me. But then I also have to go to the central server and create new data. That's not caching. But even if that's considered caching, there's a third step. I combine all those three back together again. That's not caching. But if all those concepts are caching, then that's a new form of caching, which then under Step 2 means I've made an improvement over a generic concept. Now, one thing said here is if you look at the… Our position is that's not what the invention is about. Yeah, so what this improvement… I agree with you. That's not what the invention is. It's not about improving caching. What? What it's saying is that caching cannot be the abstract concept, if that's their position. And I want to point you back to the district court's opinion on Appendix 10 and 11. What the district court said is the abstract concept actually was to accomplish receiving user-requested remotely stored information. Remotely stored. Then he goes to his Step 2 analysis and says, okay, I have these same three steps that I've been talking about all day, which I have been. It's effectively caching. But the only limitation of those three that's talking about storage is the local, not even the central. So we think that was error right there, that connection. But when you collapsed all those three into caching, then is that the actual abstract concept? Or is he saying that the inventive… There is no other inventive concept. So that, to us, was a disconnect. But Council just said that the abstract concept was caching. Okay, so if that's caching, then those other three elements, which are not caching, at least two out of the three are not caching, combined together, we still have those in the claims. So under Step 2 analysis, I'm just saying that that cannot be the case. And that's why we go back to our position. What these patents are directed to, the abstract concept, or the actual under Step 1, is to create 3D visualizations for user requests. And how did that patent accomplish that? By using these three steps that got around the prior art problems of both bandwidth issues and processing issues. We've been talking about nothing but the bandwidth process… I'm sorry, bandwidth problems in the prior art. But the actual specifications say there was a processing problem. Okay, Council, we are over time. I want to thank you, Council, for your time. Thank you. Thank you, Your Honor.